Jolly *v.* J. M. Hampton & Sons Lbr. Co.

5-2553                                    353 S. W. 2d 338

Opinion delivered February 5, 1962.

*Donald Poe,* for appellant.

*Mahony & Yocum,* for appellee.

Carleton Harris, Chief Justice. This is a Workmen's Compensation case. Jim Jolly was employed by J. M. Hampton and Sons Lumber Company, as a sawmill worker, near Mt. Ida, Arkansas. On the morning of October 13, 1959, Jolly, while performing the duties of his employment, came in contact with a defective conduit carrying electricity, and received an electric shock, and burns about the face, arm and leg. He was rendered unconscious for several hours, and was taken to St. Joseph's Hospital in Hot Springs, where he was hos-

pitalized under the care of the Burton-Eisele Clinic. Jolly was discharged a few days later, but between November 11, 1959, and the middle of April, 1960, appellant was, at intervals, in St. Joseph's Hospital for more than 40 days for treatment, and for skin grafting on his face, mainly the lip and nose. Jolly was paid compensation for a period of twenty-seven weeks and five days, and on April 25th, received his final check in the amount of $36.49, which he refused to cash. On the same date, he resumed work at Hampton's Mill. His duties were different from those engaged in before the accident, but his pay was the same. Claim for additional compensation was filed, wherein Jolly sought compensation for disfigurement, and permanent partial disability for loss of hearing and impairment of eye-sight. After a hearing before the full Commission, Jolly's claim was denied and dismissed by that tribunal, and on appeal to the Montgomery Circuit Court, the Commission was affirmed. From such judgment of the court, comes this appeal. Appellant relies upon four points for reversal, the first three dealing with the failure of the Commission and Court to make an award for disfigurement, and the fourth, dealing with Jolly's failure to receive an award for permanent partial disability. The first three points are all related, and we will discuss them together.

Jolly, 55 years of age, testified that he was burned on the leg, arm, face, nose, head and lip—"All of my lip come out." He testified that part of one ear was removed in order to repair his nose, and, when meeting people, he was embarrassed because of his scars. The report of Dr. James A. Jenkins was offered by appellant, and pertinent portions are as follows:

"There is a skin graft scar, wedge shaped, approximately 2 x 1 1/2 x 1 1/2 cm., in the upper lip, and a nearly circular scar from skin grafting on the left nasal ala. There is a 12 x 15 cm. scar on the lateral aspect on the middle one-third of the left leg. He also has a very mild hyperopia. Neurological examination reveals an anesthesia of the upper lift and left nasal ala. There is

also a donor site scar from the skin graft on the helix of the left ear.

It is my opinion that these scars are of disfiguring nature on his face and are permanent. The anesthesia associated with these scars is also permanent.''

Two letters from Dr. James H. French of the Burton-Eisele Clinic, relative to Jolly's condition, were offered in evidence as follows:

"Mr. Jolly was operated April 9, 1960, at which time he had division of the pedicle graft from the cheek to the nose, and further plastic repair to the upper lip. He was discharged from the hospital April 14, 1960, and was last seen in this office April 18, 1960. He was discharged to return to work April 25, 1960.

This patient will be left with noticeable scars about the upper lip and nose, but his prognosis otherwise is good. *  *  *

Mr. Jolly's disability will be of a cosmetic nature, that is, scarring of the lips, nose, left cheek and ear. There should be no other physical handicap resulting from his injury.''

Appellant vigorously contends that the disfigurement alone warranted an award. Cases are cited from four states in support of his argument, viz, New York, Illinois, South Carolina, and New Jersey, but these cases are really of no aid to appellant, for statutes of those states are different from the Arkansas Statute. Section 81-1313, Ark. Stats., Anno., subsection (g) provides:

"The Commission shall award compensation for serious and permanent facial or head disfigurement in a sum not to exceed two thousand ($2,000.00) dollars, *based solely upon the effect such disfigurement shall have on the future earning capacity of the injured employee in similar employment.*[1] No award for disfigurement shall be entered until twelve (12) months after the injury.''

---

[1] Emphasis supplied.

The statutes of the states referred to do not contain the italicized provision. Of course, under this provision, the authority of the Commission to make an award for disfigurement is somewhat limited. Actually, this Court has already held that the only compensable disfigurement is one that affects earning capacity in a similar employment. *Long-Bell Lumber Company* v. *Mitchell*, 206 Ark. 854, 177 S. W. 2d 920. It is true that that decision was rendered under our first Workmen's Compensation Act (Act 319 of 1937), but the provisions of the section of that act relating to disfigurement are substantially the same as the present statute.[2] If anything, it appears that the present statute requires even more of a showing that the disfigurement must affect the future earning capacity of the injured employee.

There is no substantial evidence in this record that Jolly's future employment has been impaired because of the disfigurement. Perhaps one could be so horribly disfigured that his appearance in itself would furnish sufficient evidence that employers would not be prone to employ him, and, of course, people engaged in some vocations or professions would be more adversely affected by disfigurement than those employed in other occupations. For instance, a receptionist, model, beautician, salesman, teacher, *i.e.*, people who constantly deal with, and are before the public, would be much more apt to be refused employment because of their appearance than persons who were seeking employment in capacities where they would only come in contact with fellow employees. In the case before us, Mr. Jolly testified that he believed he was a better looking man before the accident, and this is undoubtedly true, but again, the award is only made when his future earning capacity in similar employment is affected. The Commission found:

---

[2] Under Act 319 of 1937: "The Commission shall award proper and equitable compensation for serious and permanent facial or head disfigurement, but not exceeding the sum of two thousand dollars ($2,000.00), provided, however, that in making such an award the Commission shall consider only the effect such disfigurement shall have on the future earning capacity of the injured employee in similar employment; and provided, further, that no such award shall be entered until 12 months after the injury."

"It is true that there are some appearances of disfigurement of claimant's face, though skillful plastic surgery has tended to reduce it to a considerable extent. However, there is no evidence in the case to meet the requirement of the statute that such disfigurement has had effect upon the claimant's future earning capacity in similar employment."

Appellant contends that the Commission acted arbitrarily in refusing to accept the proffered evidence of Delbert Byers, a witness on behalf of appellant, who was asked the question: "Do you know whether or not that facial condition that he's got, would interfere with getting employment in your part of the country over there?" A. "Well, it would to a certain extent." Objection was made by appellees and the objection was sustained.

We agree that this was not competent evidence. Byers, a son-in-law of Jolly, possessed no particular qualifications for determining the likelihood of Jolly's being refused employment. The record does not reflect that he was an employer, or a personnel director, or that he had any experience in employing job applicants. Of course, were it otherwise, the answer is far from positive, and the phrase, "it would to a certain extent", is rather vague; likewise, there is no reference to the type of employment the witness referred to. There is no evidence in the record that Jolly had been refused employment, or (with the exception of the statement of Byers) that his disfigurement will cause, or tend to cause, any refusal in the future of employment similar to that engaged in at the time the injury was received. Actually, it is difficult to determine from the record the extent or seriousness of the disfigurement. There are no pictures of Jolly in the record, and accordingly, we have no manner of ascertaining his exact appearance. While the condition is permanent, the finding of the Commission, heretofore quoted would indicate that appellant's appearance is not abhorrent or repugnant. It follows that this contention must fail.

Appellant contends that he is entitled to compensation for permanent partial disability for loss of hearing and impairment of eyesight. Jolly testified he had "good" vision and hearing prior to the accident. He stated that it is now difficult to hear anything at all while in noisy surroundings; that he did not wear glasses before he was injured. Audrie Black, a fellow employee, stated Jolly was always "a little hard of hearing", but the condition had worsened since the injury. Delbert Byers testified that his father-in-law formerly helped his (Jolly's) grandchildren with their school lessons, but "he just can't see that fine print in them books any more." He stated that Jolly formerly would read the paper, but had ceased to do so; that when the television was in operation, it was necessary to walk over to appellant's chair in order to make him understand conversation. "To me, he just can't separate two different rackets apart. He can't—he is just liable to start talking to you about something you haven't even mentioned when you ask him something." The witness said that appellant's hearing was somewhat defective before the accident, but had grown considerably worse since that time. Jolly's wife, Victoria, testified that her husband could not hear as well as before he received the injury, though she did admit some prior difficulty. "One of his ear drums was affected when he was a child, and that's all of the trouble that there was any way at all." She stated that his hearing was failing "a little" before the accident, "not too much." Morgan Hampton, an employee of the lumber company, testified that he thought Jolly's hearing was worse after receiving the burns.

The Commission, in compliance with a request of appellant's counsel, appointed two physicians to examine Jolly, with the view of determining whether his condition was attributable to the injury that he had received. Dr. H. A. Ted Bailey, Jr., was appointed to make an examination relative to loss of hearing, and Dr. John M. Fulmer was directed to make an examination with regard to Jolly's vision. Dr. Bailey issued the following report:

"I examined Mr. Jim Jolly today, 2/13/61, and his ear canals were normal except for a large piece of wax which was removed from the left canal. The drums were both perfectly normal. Tuning fork tests and audiometric examination demonstrated a high tone hearing loss which is due to damage to the nerve of hearing on each side. AMA percentage loss was 42% in the right ear and 15% in the left. Inasmuch as his repeated pure tone testing came out the same each time and because the speech audiometry was compatible with the results of the pure tone tests we feel that this represents a true loss of hearing and this patient was not giving false responses in any way. As to the cause of his hearing loss, I am not familiar with any work in the medical literature and I have had no personal experience where an electric shock has caused any hearing damage. It is my opinion that most likely this hearing loss was not produced by the electrical shock which this patient had two years ago."

Dr. Fulmer, on February 15, 1961, issued his report as follows:

"The positive findings in this case are the pterygiums and the early cataract of the right eye. The pterygiums are not related to his injury. The corrected visual acuity of 2/25+ would represent a visual loss of 3% in each eye and this is due to the astigmatism produced by the pterygiums. His difficulty in reading without glasses is due to presbyopia and is normal for a person of his age (55).

In determining the cause of the early cataract in the right eye, two factors have to be evaluated, the first factor is age and the second factor is electrical shock. Both factors can produce this type of cataract and I cannot differentiate or prove which factor is at fault. At the present time the cataract is not interfering with his vision but may very well do so within the next two to six years. I know of no way to prove whether or not the cataract is the direct result of his electrical shock or not."

Of course, under our oft repeated rule, we are only concerned with whether there was any substantial evidence to support the findings of the Commission. We hold that Dr. Bailey's report constitutes substantial evidence to support the finding made.

As to the alleged loss of vision, Dr. Fulmer's report finds that pterygiums were not related to the injury, and he states that it is normal for a person of Jolly's age to find it difficult to read without glasses. As will be noted, the report is not positive as to the cause of the cataract in the right eye, the doctor stating that this could be due to the age factor or to electrical shock. It is necessary that a claimant establish that his disability is occasioned by the injury received in the course of employment. *Pruitt* v. *Moon*, 230 Ark. 986, 328 S. W. 2d 71. Dr. Fulmer did state positively that the cataract is not presently interfering with appellant's vision, so, of course, it could have no effect upon his present complaint. At any rate, it was within the province of the Commission to determine which factor applied. We cannot say, particularly in view of the overall report, that the Commission's findings were not supported by substantial evidence.

Affirmed.

JOHNSON, J., dissents in part.